UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| JAMES JETT, | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| *vs.* | ) | No. 1:20-cv-02976-JMS-DLP |
| | ) | |
| ISS FACILITY SERVICES, INC., | ) | |
| | ) | |
| *Defendant*. | ) | |

## ORDER

Plaintiff James Jett worked as an HVAC Mechanic for Defendant ISS Facility Services,

Inc. ("ISS") from 2016 until his termination in December 2019.  He then initiated this litigation

against ISS, setting forth claims for discrimination and retaliation under 42 U.S.C. § 1981 and Title

VII of the Civil Rights Act of 1964 ("Title VII"), and discrimination under the Age Discrimination

in Employment Act, 29 U.S.C. § 621 ("ADEA").  ISS has now filed a Motion for Summary

Judgment, [Filing No. 52], and a Motion to Strike Plaintiff's Brief in Opposition to Defendant's

Motion for Summary Judgment, [Filing No. 66], both of which are ripe for the Court's review.

## I.
### MOTION TO STRIKE

At the outset, the Court considers ISS's Motion to Strike Plaintiff's Brief in Opposition to

Defendant's Motion for Summary Judgment, as its decision affects the facts that it will consider in

connection with the Motion for Summary Judgment.

In support of its Motion to Strike, ISS argues that evidence upon which Mr. Jett relies for

certain propositions does not support those propositions, and that other propositions are only

supported by his own "self-serving" affidavit.  [Filing No. 66 at 1-3.]  In his response, Mr. Jett

addresses ISS's arguments in connection with each proposition, arguing that those propositions are

supported by credible record evidence.  [Filing No. 67 at 1-4.]  ISS reiterates its arguments in its reply.  [Filing No. 68 at 1-6.]

As to ISS's argument that the evidence upon which Mr. Jett relies does not support some of his propositions, the Court notes that it has considered the parties' arguments set forth in their briefs on the Motion to Strike, and that it is perfectly capable of determining whether a certain proposition is supported (or disputed) based on the evidence before it.

With respect to ISS's argument that Mr. Jett's affidavit is "self-serving" and not sufficient to support certain propositions, the Seventh Circuit Court of Appeals has instructed that "the term 'self[-]serving' must not be used to denigrate perfectly admissible evidence through which a party tries to present its side of the story at summary judgment." *Hill v. Tangherlini*, 724 F.3d 965, 967 (7th Cir. 2013); *see also Berry v. Chicago Transit Auth.*, 618 F.3d 688, 691 (7th Cir. 2010) ("[W]e long ago buried – or at least tried to bury – the misconception that uncorroborated testimony from the non-movant cannot prevent summary judgment because it is 'self-serving.'").  The fact that Mr. Jett's affidavit supports his case is not grounds for disregarding it.  Given that the Circuit "buried" such an argument over a decade ago, ISS and its counsel are cautioned to avoid raising such an argument in the future.

The Court **DENIES** ISS's Motion to Strike.  [Filing No. 66.]  The facts set forth below in connection with ISS's Motion for Summary Judgment reflect the Court's careful consideration of the record, in accordance with the applicable standard of review.

## II.
### MOTION FOR SUMMARY JUDGMENT

### A.     Standard of Review

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment

as a matter of law.  *See* Fed. R. Civ. P. 56(a).  On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events.  *Johnson v. Cambridge Indus.*, 325 F.3d 892, 901 (7th Cir. 2003).  "'Summary judgment is not a time to be coy.'"  *King v. Ford Motor Co.*, 872 F.3d 833, 840 (7th Cir. 2017) (quoting *Sommerfield v. City of Chicago*, 863 F.3d 645, 649 (7th Cir. 2017)).  Rather, at the summary judgment stage, "[t]he parties are required to put their evidentiary cards on the table."  *Sommerfield*, 863 F.3d at 649.

The moving party is entitled to summary judgment if no reasonable fact-finder could return a verdict for the non-moving party.  *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009).  The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor.  *Darst v. Interstate Brands Corp.*, 512 F.3d 903, 907 (7th Cir. 2008).  It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder.  *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011).

Each fact asserted in support of or in opposition to a motion for summary judgment must be supported by "a citation to a discovery response, a deposition, an affidavit, or other admissible evidence."  S.D. Ind. L.R. 56-1(e).  And each "citation must refer to a page or paragraph number or otherwise similarly specify where the relevant information can be found in the supporting evidence."  *Id.*  The Court need only consider the cited materials and need not "scour the record" for evidence that is potentially relevant.  *Grant v. Trustees of Ind. Univ.*, 870 F.3d 562, 572-73 (7th Cir. 2017) (quotations omitted); *see also* Fed. R. Civ. P. 56(c)(3); S.D. Ind. L.R. 56-1(h).  Where a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact, the Court may consider the fact undisputed for purposes of the summary judgment motion.  Fed. R. Civ. P. 56(e)(2).

In deciding a motion for summary judgment, the Court need only consider disputed facts that are material to the decision. A disputed fact is material if it might affect the outcome of the suit under the governing law. *Hampton v. Ford Motor Co.*, 561 F.3d 709, 713 (7th Cir. 2009). In other words, while there may be facts that are in dispute, summary judgment is appropriate if those facts are not outcome determinative. *Harper v. Vigilant Ins. Co.*, 433 F.3d 521, 525 (7th Cir. 2005). Fact disputes that are irrelevant to the legal question will not be considered. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

**B.     Statement of Facts**[1]

   *1.     Mr. Jett's Positions at ISS*

Mr. Jett, who is African American and is sixty-five years old, began working for ISS in April 2016 as an HVAC Mechanic. [Filing No. 53-3 at 7; Filing No. 60-2 at 7; Filing No. 60-6 at 1.] ISS provides facility management services to its clients, including Rolls Royce at the Rolls Royce Meridian Center in Indianapolis, Indiana ("the Center"). [Filing No. 53-1 at 4.] Mr. Jett was assigned to work at the Center and his responsibilities included preventative maintenance and repairs to the Center's HVAC systems, including large systems, chillers, air handling units, and controls. [Filing No. 60-2 at 7; Filing No. 60-3 at 19.] In 2018, Mr. Jett was tasked with leading the HVAC team, which was made up of Mr. Jett, Michael Greaves, and Lisa Bailey. [Filing No.

---

[1] The Court's Practices and Procedures provide that "[i]n a supporting brief, [a party must] cite to the docket number, the attachment number (if any), and the applicable .pdf page as it appears on the docket information located at the top of the filed document," and provide an example of the proper citation form. [Filing No. 5 at 4.] Neither party followed this citation form, instead citing to the name of the exhibit and the internal page numbers. The parties' failure to follow the Court's Practices and Procedures has made the Court's review of the Motion for Summary Judgment unnecessarily cumbersome. The Court expects full compliance with its Practices and Procedures in this and other litigation going forward.

60-3 at 17-19.]  Jason Parrish became Mr. Jett's supervisor in 2017 and was his supervisor for the remainder of Mr. Jett's employment at ISS.  [Filing No. 60-2 at 7-8.]

Mr. Jett received overall performance evaluation ratings of "exceeding expectations" from 2017 to 2019.  [Filing No. 60-2 at 17.]  On July 9, 2019, he was nominated for and received an Apple Award from ISS, which is awarded for going above and beyond work duties.  [Filing No. 60-2 at 17; Filing No. 60-3 at 39; Filing No. 60-4 at 23.]  Before his eventual termination, Mr. Jett had never been written up or been the subject of any type of corrective action.  [Filing No. 60-6 at 1.]

### 2.   *Mr. Jett's Co-Workers*

#### a.   <u>Michael Greaves</u>

Michael Greaves, who is African American, began working for ISS in December 2017 as a part-time maintenance technician and remained in that position when he later became a full-time employee.  [Filing No. 60-7 at 3-4.][2]  Mr. Greaves performed general maintenance work at the Center, including drywalling and painting.  [Filing No. 60-3 at 14.]  When he was a part-time employee, Mr. Parrish, who was the facility manager, assigned Mr. Greaves to do electrical work with Andrew Johnson, an ISS electrician, even though Mr. Greaves was not a trained electrician.  [Filing No. 60-7 at 3.]  In 2018, Mr. Greaves was assigned to the HVAC team with Mr. Jett and Ms. Bailey.  [Filing No. 60-3 at 20; Filing No. 60-6 at 2.]  Mr. Parrish was Mr. Greaves' direct supervisor.  [Filing No. 60-7 at 4.]  After Mr. Greaves became a full-time employee, Mr. Parrish asked him to work on electrical issues with Mr. Jett but to not let Rolls Royce know.  [Filing No.

---

[2] Mr. Greaves' Affidavit, [Filing No. 60-7], and Mr. Jett's Second Affidavit, [Filing No. 60-14], were both filed backwards, with the pages in reverse chronological order.  Counsel is cautioned to make it a practice to double-check documents after they are electronically filed, to make sure they appear as counsel intended.

60-7 at 3.]  Prior to November 13, 2019, Mr. Greaves had never received any written or verbal warnings due to his performance.  [Filing No. 60-7 at 4.]

### b.  Andrew Johnson

Andrew Johnson, who is Caucasian and was under the age of forty while Mr. Jett was an ISS employee, was hired in April 2016 as an electrician at ISS.  [Filing No. 60-2 at 15; Filing No. 60-3 at 35-36; Filing No. 60-4 at 12.]  Mr. Johnson's job responsibilities included performing electrical work in the Center.  [Filing No. 60-2 at 14; Filing No. 60-4 at 52.]  His supervisor was Mr. Parrish.  [Filing No. 60-4 at 20.]

### c.  Jason Parrish

Mr. Parrish is Caucasian.  [Filing No. 53-2 at 5.]  He began working at ISS in August 2016, as a general maintenance technician.  [Filing No. 53-2 at 7.]  In 2017, Mr. Parrish was promoted to the position of facility manager, and his job responsibilities included supervising maintenance staff at the Center and overall management of the property.  [Filing No. 53-2 at 7; Filing No. 60-3 at 10.]  All ISS technicians at the Center reported to Mr. Parrish.  [Filing No. 60-4 at 11.]

### 3.  The Lock-Out/Tag-Out Procedure

Rolls Royce required ISS to use a safety procedure called lock-out/tag-out ("the LOTO Procedure") when repairing electrical equipment.  [Filing No. 60-2 at 100-01.]  The LOTO Procedure entailed the following:

- The machine being repaired is powered down;

- The machine is disconnected from its energy source;

- Authorized personnel attach a lock onto the machine, thereby preventing the machine from being powered on;

- Workers performing repair or maintenance on the machine place a tag on the machine to indicate that the repair or maintenance is ongoing and that further operation of the machine is prohibited; and

6

- Authorized personnel verify that the machine has been disconnected from its energy source and that there is no residual energy stored in the machine.

[Filing No. 60-2 at 100-01; Filing No. 60-3 at 27; Filing No. 60-4 at 18-19.]  When each step of the LOTO Procedure is followed, the machine will not spark or carry a charge.  [Filing No. 53-3 at 33.]  When multiple technicians worked on a piece of electrical equipment, each employee was required to place their lock and tag on the equipment.  [Filing No. 60-4 at 20.]

Mr. Jett and Mr. Johnson were the only two individuals who were trained and authorized to perform the LOTO Procedure at the Center.  [Filing No. 60-2 at 32; Filing No. 60-3 at 27-28; Filing No. 60-6 at 2.]  In 2019, Mr. Jett was undergoing medical treatments that caused him to develop cataracts, which prevented him from performing the LOTO Procedure from May 2019 until his eventual termination.  [Filing No. 60-2 at 32.]  ISS was aware of Mr. Jett's cataracts and that they prevented him from performing the LOTO Procedure.  [Filing No. 60-2 at 32; Filing No. 60-3 at 116-17.]

Mr. Johnson performed the LOTO Procedure on HVAC projects involving electrical work for Ms. Bailey and Mr. Greaves when Mr. Jett was unavailable or unable to do so.  [Filing No. 60-3 at 20.]  Due to Mr. Jett's visual limitations resulting from cataracts, Mr. Johnson performed all LOTO Procedures at ISS from May 2019 to December 2019.  [Filing No. 60-2 at 28.]

Mr. Greaves witnessed Mr. Johnson failing to perform the LOTO Procedure consistently, every time that HVAC electrical work was performed.  [Filing No. 60-6 at 3; Filing No. 60-7 at 3.]  On at least one occasion, the HVAC technicians were instructed by Mr. Parrish to lock out the breakers by closing the mechanic room door as an alternative to performing the LOTO Procedure. [Filing No. 60-2 at 36.]  In practice, Mr. Johnson and Mr. Jett would open the breaker, confirm the power was off, and shut the door to the panel and the equipment room as an alternative to

7

performing the LOTO Procedure.  [Filing No. 60-6 at 2.]  Mr. Parrish was aware of this practice.

[Filing No. 60-6 at 2.]  Mr. Parrish was only concerned about employees performing the LOTO

Procedure when ISS was working with outside contractors or when technicians were waiting on

equipment.  [Filing No. 60-6 at 2.]

### 4.    The October 17, 2018 Incident

On October 17, 2018, Mr. Jett fell from a ladder while attempting to remove a light fixture.

[Filing No. 53-12.]  Specifically, the incident was described as follows on an Incident/Near Miss

Investigation Form:

> Donald Jett was standing on a 4' ladder with a spotter (Michael Greaves) attempting
> to remove the existing inoperable light fixture when the screw Donald was
> loosening suddenly broke free which caused Donald to lose his footing, stumble
> down the ladder and [fall] backward into the wall to which the back of his head
> made contact with the wall.  Donald sat for a min[ute] to collect himself; at this
> point Donald had no external injuries.  Donald feeling that he was ok stood up, at
> that time Donald partially blacked out and fell into a piece of equipment where he
> cut his head then sprained his wrist from attempting to brace himself for the fall.  I
> Jason Parrish…was then notified, upon my arrival I found Donald sitting in a chair
> outside of the AHU holding a pressure dressing on his open head wound as some
> blood was lost.  I informed him he needed to stay seated while I contacted ISS HSE
> Manager Terry Hellman and contacted Concentra Medical.  The job was inside the
> AHU located inside the building, no equipment was damaged.  The tools involved
> [were] a 4' ladder and a pair of channel locks.  The machinery was properly LOTO
> [and] all PPE and FR gear were worn.

[Filing No. 53-12 at 2.]  The Incident/Near Miss Investigation Form does not indicate that Mr. Jett

was disciplined in any way for the incident.  [*See* Filing No. 53-12 at 2-8.]

### 5.    Mr. Parrish's Racial Comments

Mr. Parrish made openly disparaging comments about African Americans around other

employees, including the following:

- During a conversation with two ISS employees, Mr. Parrish stated that there
  was no "white privilege" and "the White race is the only race you can legally

discriminate against, the Black race has had several kinds of laws that keep propping them up." [Filing No. 60-14 at 2.][3]

- Mr. Parrish also told the two ISS employees that "when they [Black people] start 'whining' people should tell them to 'shut the f**k up.'" [Filing No. 60-14 at 2.]

- Mr. Parrish stated that the White race places an emphasis on education, family, and religion, and that is why the White race is successful.  [Filing No. 60-14 at 2.]

- Mr. Parrish stated that the Democrats passed laws in the 1970s allowing individuals with illegitimate children to receive benefits and that started the "decline of the Black family." [Filing No. 60-14 at 1.]

- Mr. Parrish stated that the Democratic policy "has led us to exactly where we are now, fatherless families," and "Black people place importance on their boys and not the law and education." [Filing No. 60-14 at 1.]

- Mr. Parrish stated that the "Democrats ignore them [Black people] every election cycle and then the Democrats go, 'hey y[']all we got hot sauce in our purse too' [j]ust like Hillary, she was trying to talk like them." [Filing No. 60-14 at 1 (emphasis omitted).]

Mr. Parrish would also humiliate and embarrass Mr. Greaves in front of Caucasian employees.

[Filing No. 60-7 at 2-3.]

### 6.   *The November 13, 2019 Incident*

On November 13, 2019, Mr. Jett, Mr. Greaves, Ms. Bailey, and Mr. Johnson were working at the Center installing a motor in a machine called a VAV box ("the November 13, 2019 Incident").  [Filing No. 60-6 at 3.]  Mr. Johnson went up into a lift and told Mr. Jett to go open the breakers while Mr. Johnson inspected the motor.  [Filing No. 60-2 at 32; Filing No. 60-6 at 3.] Mr. Jett remained on the ground.  [Filing No. 60-2 at 33.]  After inspecting the VAV box, Mr.

---

[3] Mr. Jett refers numerous times to "Exhibit L" in his response brief, which is a flash drive for which Mr. Jett filed a Notice of Manual Filing and then sought and obtained an extension of time to March 1, 2022 by which to manually file the flash drive.  [Filing No. 61; Filing No. 62; Filing No. 63.]  To date, Mr. Jett has not manually filed Exhibit L, so the Court has disregarded any citations to that exhibit.

Johnson instructed Mr. Greaves that it was safe to change the motor.  [Filing No. 60-2 at 32-33; Filing No. 60-6 at 4.]  Mr. Greaves and Mr. Johnson successfully changed the motor without any sparks during the installation.  [Filing No. 60-6 at 3-4.]  Ms. Bailey saw sparks during the installation process and Dan Keller, Custodial Manager for ISS, heard the sounds of a spark.  [Filing No. 53-6 at 2; Filing No. 53-7 at 2.]  Mr. Johnson verified that the proper electrical procedures had been performed and that the work was satisfactory.  [Filing No. 60-7 at 2.]  Mr. Johnson did not perform the LOTO Procedure.  [Filing No. 60-2 at 32.]  Rolls Royce Safety Manager Devin Kent was also present during the motor installation and never advised that the work was being completed in an unsafe or unsatisfactory manner.  [Filing No. 60-6 at 3-4.]

### 7. *Mr. Jett's Complaints of Discrimination*

On December 3, 2019, Mr. Jett sent an email to ISS's regional manager for the Indianapolis area, Simon Martin, stating:

> I need to speak with you.  I would like to speak face to face.  I tried to speak to Jason [Parrish] yesterday and it did not work out.  I want to speak with you because it is in regard to Jason and his [v]erbal tirade towards me.  If you are not able to come here I will come to your office after my shift.  Michael Greaves has mentioned to me that he would like to attend as well.

[Filing No. 53-13 at 2.]  Mr. Martin responded the same day, stating:

> I apologize for the delay in responding, I was on phone calls all morning.  I asked [ISS Administrator] Celeste [Hunt] to talk with you to get some [background].  I am travelling for the rest of the week, I asked Celeste to try to get some time for us to talk next week.

[Filing No. 53-13 at 3.]

### 8. *Investigation of the November 13, 2019 Incident*

Meanwhile, also on December 3, 2019 but later in the day after Mr. Jett had complained about Mr. Parrish to Mr. Martin, Ms. Bailey sent an email to Ms. Hunt regarding the November 13, 2019 incident in which she stated:

10

I would like to bring some things to your attention concerning Donald Jett.

Donald told Jason [Parrish] the VAV coils needed replaced and told Jason we needed North Mechanical to perform the work because they were inaccessible. I was there when the damage was done by Michael Greaves not using a back up wrench and breaking the coil, so the VAV's were accessible and the work performed [by] North Mechanical was simple and could [have] very easily been done in house. I told Donald this and he said it was just easier to have North Mechanical do the repairs. I was also present when the repairs were performed.

There have been many situations such as this when I have assisted Donald with repairs and he didn't perform proper troubleshooting, and just replaced parts. He has asked me to change a condenser motor on a chiller and the motor was not the problem and he told me to leave the new motor on.

On November 13th Michael Greaves was on a lift and Donald was allowing him to wire a blower motor[.] Donald didn't do proper lock out tag out procedures and Michael didn't double check for current and it sparked and could of been a serious accident, also on this occasion Dan Keller was present and witnessed the near accident.

In the course of working here for the last 22 months I have encountered a lot of HVAC equipment that have not been properly maintained[, *i.e.*,] coils completely clogged with years of debris, I have also changed filters that haven't been changed in years by the date on the filter.

If you have any questions or would like to discuss this any further feel free to call me anytime.

[Filing No. 53-6 at 2.] Ms. Bailey did not mention that Mr. Johnson was present for the November 13, 2019 Incident, nor what his role was. [Filing No. 53-6 at 2.]

As part of his investigation into the November 13, 2019 Incident, Mr. Parrish spoke to Mr. Jett, Mr. Greaves, Ms. Bailey, Mr. Keller, and Mr. Johnson. [Filing No. 60-3 at 50-52.] Mr. Johnson told Mr. Parrish that the November 13, 2019 Incident "was [Mr. Jett's] project, [and] he's not aware of anything." [Filing No. 60-3 at 51-52.] Mr. Jett informed Mr. Parrish and Ms. Hunt that Mr. Johnson was present for the November 13, 2019 Incident and had gone up on the lift "to personally verify the condition of the motor and speed control" and "confirmed that the power

source was dead and that it was ok to remove the old motor and install the new motor." [Filing No. 60-10 at 2-3.]

Also on December 3, 2019, Mr. Jett observed Mr. Johnson, Ms. Bailey, and Mr. Parrish conferring with each other – the same day that Mr. Jett had sent his email complaining about Mr. Parrish to Mr. Martin, and the same day that Ms. Bailey had emailed her complaints about Mr. Jett to Ms. Hunt.  [Filing No. 60-2 at 39.]

### 9.      Mr. Jett's Suspension

On December 4, 2019, Mr. Jett spoke to Ms. Hunt, raised concerns regarding Mr. Parrish's treatment of him and Mr. Greaves due to their race, and also expressed concerns that Mr. Parrish and Mr. Johnson were trying to get him fired.  [Filing No. 60-6 at 4-5.]  Later that same day, Mr. Jett attended a meeting with Ms. Hunt, Mr. Greaves, and Mr. Parrish, but instead of discussing Mr. Jett's concerns regarding Mr. Parrish, Mr. Jett was told that he was being suspended for safety violations.  [Filing No. 60-6 at 5.]

### 10.     Mr. Jett's Termination

On December 14, 2019, Mr. Jett was terminated for violating safety rules related to the November 13, 2019 Incident – specifically, because he did not follow the LOTO Procedure and for instructing Mr. Greaves to perform electrical work.  [Filing No. 53-9 at 2; Filing No. 60-3 at 79-80; Filing No. 60-6 at 6.]  Mr. Greaves was also terminated in connection with the November 13, 2019 incident for failing to perform the LOTO Procedure.  [Filing No. 60-6 at 3.]  Mr. Martin,

Ms. Hunt, Mr. Sawyer, and Mr. Parrish made the decision to terminate Mr. Jett and Mr. Greaves. [Filing No. 60-3 at 80-81.]<sup>4</sup>

> **11.   The Lawsuit**

Mr. Jett initiated this litigation on November 13, 2020 and sets forth the following claims in his Complaint: (1) race discrimination in violation of § 1981; (2) race discrimination in violation of Title VII; (3) retaliation in violation of Title VII; (4) retaliation in violation of § 1981; (5) failure to promote in violation of § 1981; (6) failure to promote in violation of Title VII; and (7) age discrimination in violation of the ADEA.  [Filing No. 1.]  ISS has moved for summary judgment on all of Mr. Jett's claims.  [Filing No. 52.]

**C.   Discussion**

> *1.   Failure to Promote Claims*

At the outset, the Court notes that although he asserts claims in his Complaint for failure to promote under § 1981 and Title VII, Mr. Jett does not include those claims in his Statement of Claims, [*Compare* Filing No. 1 *with* Filing No. 55], nor does he respond to ISS's arguments that it sets forth in its brief in support of its Motion for Summary Judgment related to those claims, [*see*

---

<sup>4</sup> The Court notes that Mr. Jett's response is rife with statements that extrapolate from the record, and cite to evidence that does not go all the way to supporting his statements.  For example, Mr. Jett lists in his "Statement of Material Facts In Dispute" the following: "Jason Parrish testified that Mr. Jett was terminated for failing to perform LOTO procedures on the breaker box," and cites to "Ex. B Parrish Dep. p. 52, ll. 17-25."  But lines 17 to 25 of Mr. Parrish's deposition transcript state: "have locks to that door.  And the problem since there wasn't a lock-out device on the breaker itself, if someone was to walk in there and see it, they could flip the breaker on not knowing that Don and Michael were 200 feet down the hall working on this and they could have been electrocuted.  So Don should have put his locking device on the breaker with his lock and a tag with his name and his phone number."  [Filing No. 68-3 at 52.]  While this testimony relates to something Mr. Parrish believes Mr. Jett should have done, it does not address the reason for Mr. Jett's termination, and is just one of the many instances in which Mr. Jett makes a statement that goes a step further than the evidence to which he cites.  This practice is not helpful to the Court, nor to Mr. Jett's counsel's credibility.

Filing No. 60].  "Federal courts possess certain 'inherent powers,' not conferred by rule or statute, 'to manage their own affairs so as to achieve the orderly and expeditious disposition of cases.'" *Goodyear Tire & Rubber Co. v. Haeger*, --- U.S. ----, 137 S. Ct. 1178, 1186 (2017) (quoting *Link v. Wabash R. Co.*, 370 U.S. 626, 630-31 (1962)).  "District courts often exercise this authority by ordering parties to submit a specific list of claims and theories (superseding all prior assertions) to clarify the issues as trial approaches." *Jackson v. Regions Bank*, 838 Fed. App'x 195, 198 (7th Cir. 2021).  The Court did so here, and finds that, because he failed to list the failure-to-promote claims in his Statement of Claims, Mr. Jett has abandoned those claims.  *Id.* (affirming this Court's treatment of claims not preserved in the Statement of Claims as abandoned).  Accordingly, the Court **GRANTS** ISS's Motion for Summary Judgment on Mr. Jett's failure-to-promote claims under Title VII and § 1981.

The Court will now consider Mr. Jett's remaining claims.

### 2. *Title VII and § 1981 Race Discrimination Claims*

In support of its Motion for Summary Judgment, ISS argues that Mr. Jett cannot establish a prima facie case of race discrimination because his performance did not meet ISS's legitimate expectations since he violated ISS policy by failing to perform the LOTO Procedure in connection with the November 13, 2019 Incident.  [Filing No. 53 at 6-9.]  It also asserts that Mr. Jett has not identified similarly situated employees who were treated more favorably than he was because he only vaguely refers to a similarly situated Caucasian employee who "engaged in conduct of comparable seriousness" but was not terminated.  [Filing No. 53 at 10.]  It notes that Mr. Jett has not shown "that any such employee reported to the same supervisor, was subject to the same standards, and [was] without differentiating circumstances." [Filing No. 53 at 10.]  ISS contends that Mr. Johnson is not a similarly situated individual because he is an electrician, and that Ms.

Bailey is not similarly situated because she is a "generalist with minimal experience in HVAC." [Filing No. 53 at 10.]  ISS also asserts that, unlike Mr. Jett, neither Mr. Johnson nor Ms. Bailey were the subjects of a LOTO Procedure violation, nor did any investigation result in a finding that they violated the LOTO Procedure.  [Filing No. 53 at 10.]  Additionally, ISS points to a previous safety violation by Mr. Jett, and argues that neither Mr. Johnson nor Ms. Bailey had similar disciplinary or performance histories.  [Filing No. 53 at 11.]  Finally, ISS argues that even if Mr. Jett could establish a prima facie case of discrimination, he was terminated for a legitimate, non-discriminatory reason – that he failed to perform the LOTO Procedure in connection with the November 13, 2019 Incident.  [Filing No. 53 at 11-12.]

In his response, Mr. Jett argues that he was meeting ISS's legitimate expectations because he received favorable evaluations and received an Apple Award in 2019.  [Filing No. 60 at 14-15.] He argues further that ISS applied its disciplinary policy in a discriminatory manner, and that Mr. Johnson was involved in the November 13, 2019 Incident but was not disciplined or terminated even though Mr. Jonson told Mr. Greaves that the VAV box had been de-energized and instructed him to change the motor.  [Filing No. 60 at 15-16.]  Mr. Jett asserts that Mr. Johnson is similarly situated to him because they were both supervised by Mr. Parrish, they were subject to the same rules and regulations with respect to the LOTO Procedure, they were the only two ISS employees who were qualified to perform the LOTO Procedure, Mr. Johnson was present for the November 13, 2019 Incident, and Mr. Johnson was performing the LOTO Procedure at ISS because Mr. Jett had cataracts and could not do so.  [Filing No. 60 at 17-19.]  Mr. Jett also contends that he has presented sufficient evidence to show that ISS's reasons for terminating him were pretextual, including that Mr. Johnson engaged in similar or worse conduct than him during the November 13, 2019 Incident but was not disciplined or terminated, and that ISS provided shifting reasons for

his termination.  [Filing No. 60 at 20-21.]   Mr. Jett points to additional evidence of racial discrimination regarding his termination – specifically, that Mr. Parrish made openly disparaging comments about African Americans, that he criticized Mr. Jett for asking for assistance from other HVAC team members, that he yelled at Mr. Jett and Mr. Greaves and accused them of disrespecting him, and that he conferred with Ms. Bailey and Mr. Johnson the same day that Mr. Jett was terminated and that Ms. Bailey sent her complaint to Mr. Martin.  [Filing No. 60 at 21-22.]

In its reply, ISS reiterates its arguments that Mr. Jett was not meeting ISS's legitimate expectations and that he has not identified a similarly situated comparator.  [Filing No. 65 at 1-5.] It argues further that Mr. Jett has not presented evidence of racial animus, asserting that Mr. Parrish "provided [Mr. Jett] glowing performance reviews," that Mr. Jett has not shown Mr. Parrish's disparaging remarks were made at the time that the decision to terminate his employment was made, and that he has not shown that the disparaging comments were related to the decision to terminate his employment.  [Filing No. 65 at 6-7.]

Title VII forbids an employer from discriminating against any individual with respect to his or her "compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). 42 U.S.C. § 1981 provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other."  The analysis of a Title VII claim and a Section 1981 claim are the same, and cases discussing claims under either provision are instructive.

See *Johnson v. Gen. Bd. of Pension & Health Benefits of United Methodist Church*, 733 F.3d 722, 728 (7th Cir. 2013) ("The substantive standards and methods that apply to Title VII also apply to 42 U.S.C. § 1981.").

"[T]he singular question that matters in a discrimination case [is]: '[W]hether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the…adverse employment action,'" *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 894 (7th Cir. 2018) (quoting *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765 (7th Cir. 2016)), and a plaintiff must provide such evidence in order to survive summary judgment, *Milligan-Grimstad v. Stanley*, 877 F.3d 705, 710 (7th Cir. 2017).  A plaintiff may rely on both direct and circumstantial evidence to support an inference of causation and intent. *Joll v. Valparaiso Comm. Schs.*, 953 F.3d 923, 929 (7th Cir. 2020).  A plaintiff can also "enlist the burden-shifting framework of *McDonnell Douglas* [*Corp. v. Green*, 411 U.S. 792 (1973)]" "[t]o clarify and to simplify [his] task." *Joll*, 953 F.3d at 929 (quotation and citation omitted).  The Court's focus is to "consider[ ] [the evidence] as a whole, rather than asking whether any particular piece of evidence proves the case by itself – or whether just the 'direct' evidence does so, or the 'indirect' evidence." *Golla v. Office of Chief Judge of Cook Cnty., Ill.*, 875 F.3d 404, 407 (7th Cir. 2017) (quoting *Ortiz*, 834 F.3d at 765).  In determining whether the evidence would permit a reasonable factfinder to conclude that a plaintiff's race caused him to be treated unfairly, "the burden-shifting framework of *McDonnell Douglas* remains relevant as a means of organizing, presenting, and assessing circumstantial evidence in frequently recurring factual patterns found in discrimination cases." *Owens v. Old Wis. Sausage Co., Inc.*, 870 F.3d 662, 667 (7th Cir. 2017) (quotation and citation omitted).  But the Court "review[s] the evidence holistically to see if it permits an inference of race discrimination." *Lloyd v. Mayor of City of Peru*, 761 Fed. App'x 608,

610 (7th Cir. 2019). "[A]ll evidence belongs in a single pile and must be evaluated as a whole." *Igasaki v. Ill. Dept. of Fin. & Prof. Reg.*, 988 F.3d 948, 957 (7th Cir. 2021) (citation and quotation omitted). "All that matters at this stage is whether the totality of the evidence permits a reasonable juror to conclude that there would have been no disparity in [treatment] were [plaintiff] a different race 'and everything else had remained the same.'" *Palmer v. Indiana Univ.*, --- F.4th ----, 2022 WL 1115137, at *4 (7th Cir. April 14, 2022) (quoting *Ortiz*, 834 F.3d at 764).

Under the *McDonnell Douglas* framework, a plaintiff must "make a prima facie case of discrimination, at which point the burden shifts to the employer to offer a nondiscriminatory motive, and, if the employer does so, the burden shifts back to the plaintiff to show that the employer's stated reason was a pretext." *Purtue v. Wisconsin Dep't of Corr.*, 963 F.3d 598, 601-02 (7th Cir. 2020). To make a prima facie case under *McDonnell Douglas*, a plaintiff must show: (1) he belongs to a protected class; (2) he met his employer's legitimate expectations; (3) he suffered an adverse employment action; and (4) another similarly situated employee outside of his protected class received better treatment from his employer. *Marshall v. Indiana Dep't of Corr.*, 973 F.3d 789, 791-92 (7th Cir. 2020).

ISS's approach to summary judgment in this case seems to be that if the Court considers its version of events, Mr. Jett cannot succeed on his race discrimination claims. But ISS ignores both the appropriate standard of review on summary judgment and any evidence presented by Mr. Jett – which the Court must accept as true on summary judgment since he is the non-movant – that contradicts ISS's evidence. This evidence creates genuine issues of material fact on the issues of whether Mr. Jett was meeting ISS's legitimate expectations, whether Mr. Jett has identified a similarly situated comparator, and whether Mr. Jett has presented evidence that ISS's stated reason for terminating him was pretextual, and includes the following:

- Evidence from which a reasonable jury could conclude that Mr. Jett was meeting legitimate employment expectations:

  o Mr. Jett had cataracts due to a medical condition and could not perform the LOTO Procedure at the time of the November 13, 2019 Incident.

  o In any event, Mr. Parrish was only concerned about the LOTO Procedure being performed when ISS was working with outside contractors or when technicians were waiting on equipment.

- Evidence from which a reasonable jury could conclude that Mr. Johnson and Mr. Jett were similarly situated:

  o Mr. Johnson and Mr. Jett were both supervised by Mr. Parrish.

  o Even though Mr. Johnson was an electrician and Mr. Jett was an HVAC Mechanic, they both were specifically authorized to perform the LOTO Procedure and, in fact, were the only two ISS employees authorized to do so.

  o Mr. Johnson and Mr. Jett were both present for the November 13, 2019 Incident.

- Evidence from which a reasonable jury could conclude that ISS's reason for terminating Mr. Jett – that he failed to perform the LOTO Procedure in connection with the November 13, 2019 Incident – was pretextual:

  o Mr. Jett could not perform the LOTO Procedure because of his cataracts, which Mr. Parrish was aware of.  Instead, Mr. Johnson had been performing all LOTO Procedures.  But Mr. Johnson, who is white, was not terminated.

  o Mr. Johnson frequently did not perform the LOTO Procedure and did not perform it in connection with the November 13, 2019 Incident, yet he was not terminated.

  o Mr. Jett (who could not perform the LOTO Procedure due to cataracts) and Mr. Greaves (who is also African American and who was not authorized to perform the LOTO Procedure) were both terminated for failing to perform the LOTO Procedure.

  o Mr. Jett was not made aware of any issues with his performance related to the November 13, 2019 Incident until several weeks later and on the same day that he complained about Mr. Parrish to Mr. Martin.

  o Ms. Bailey did not email her complaints regarding Mr. Jett's performance related to the November 13, 2019 Incident until several weeks afterwards,

19

and on the same day that Mr. Jett complained about Mr. Parrish to Mr. Martin.  In her email, Ms. Bailey only mentioned that Mr. Jett and Mr. Greaves – who are both African American – were present, and did not mention that Mr. Johnson was also present.

o   Mr. Parrish, Ms. Bailey, and Mr. Johnson were seen conferring the same day that Ms. Bailey lodged her complaint regarding Mr. Jett's performance in connection with the November 13, 2019 Incident.

o   Mr. Parrish made multiple disparaging remarks in the workplace about African Americans.[5]

The Court's list is not exhaustive, and of course Mr. Jett would need to prove these facts at trial.  But the list is certainly enough to get Mr. Jett past summary judgment.  ISS cannot simply rely on its version of the facts in arguing that Mr. Jett's racial discrimination claims fail.  *See Malin v. Hospira, Inc.*, 762 F.3d 552, 564 (7th Cir. 2014) ("[The defendant] seems to have based its litigation strategy on the hope that neither the district court nor this panel would take the time to check the record…. We caution [the defendant] and other parties tempted to adopt this approach to summary judgment practice that it quickly destroys their credibility with the court.  This approach to summary judgment is also both costly and wasteful.")  And, as discussed above, ISS's dismissal of Mr. Jett's Affidavit as "self-serving" is simply not permissible under the law.  *See Berry*, 618 F.3d at 691.

It is also worth expanding on one point mentioned above, as it is instructive of ISS's approach in this matter.  ISS argues that Mr. Johnson and Mr. Jett are not similarly situated because Mr. Johnson "[was not] made the subject of a reported LOTO violation nor did any investigation result in a finding that Mr. Johnson…violated LOTO," that Mr. Johnson was not "involved in the [November 13, 2019] Incident," and that "Mr. Johnson was not reported for violating LOTO."

---

[5] Mr. Jett does not set forth a claim for discrimination due to a hostile work environment, but a reasonable jury could still rely upon Mr. Parrish's comments – combined with other evidence – to conclude that ISS's reasons for terminating Mr. Jett were pretextual.

[Filing No. 53 at 10-11; Filing No. 65 at 5.] But Mr. Jett sets forth evidence that Mr. Johnson was present at the November 13, 2019 Incident and, indeed, was the only ISS employee who could perform the LOTO Procedure on that day. And the fact that Mr. Johnson was not the subject of an investigation or that no investigation resulted in a finding that Mr. Johnson failed to perform the LOTO Procedure is really the whole point of this lawsuit. ISS's reliance on the fact that Mr. Johnson was not disciplined or terminated for failing to perform the LOTO Procedure in connection with the November 13, 2019 Incident as support for the conclusion that Mr. Johnson and Mr. Jett are not similarly situated is disingenuous.

In short, Mr. Jett has presented sufficient evidence from which a reasonable jury could conclude that he was terminated from ISS based on his race. ISS's Motion for Summary Judgment on Mr. Jett's Title VII and § 1981 race discrimination claims based on his termination is **DENIED**.

### 3.    *Title VII and § 1981 Retaliation Claims*

In support of its Motion for Summary Judgment, ISS argues that Mr. Jett cannot succeed on his retaliation claims under Title VII and § 1981 because the complaint Mr. Jett made to Mr. Martin did not mention race but only referred to Mr. Parrish's communication style. [Filing No. 53 at 14.] It also argues that Mr. Jett has not presented any evidence that management responded negatively to his complaints to Ms. Hunt and that Mr. Parrish, Mr. Martin, and Mr. Sawyer "were completely unaware [Mr. Jett] had or intended to file any such complaint." [Filing No. 53 at 14-15.]

In response, Mr. Jett argues that he engaged in statutorily protected activity by emailing Mr. Martin and requesting to speak with him about the way that Mr. Parrish had treated Mr. Jett and Mr. Greaves – ISS's only African American HVAC technicians – and by verbally complaining to Ms. Hunt the next day. [Filing No. 60 at 22-23.] He points to the timing of his termination,

noting that he emailed Mr. Martin requesting to talk to him about Mr. Parrish on the morning of December 3, 2019; he then observed Mr. Johnson, Mr. Parrish, and Ms. Bailey conferring; Ms. Baily filed a report regarding the November 13, 2019 Incident later that day; and he was terminated eleven days later.  [Filing No. 60 at 24.]

In its reply, ISS argues that Mr. Jett's claim that he verbally complained to Ms. Hunt regarding discrimination is only supported by Mr. Jett's "self-serving" affidavit.  [Filing No. 65 at 8.]  It asserts that Mr. Martin and Mr. Sawyer made the decision to terminate Mr. Jett and neither had any idea that Mr. Jett "had [filed] or intended to file a discrimination claim" when he was terminated.  [Filing No. 65 at 9.]  ISS also notes that the November 13, 2019 Incident for which Mr. Jett was terminated pre-dated his complaints to Mr. Martin and Ms. Hunt and so his complaints "cannot immunize him from being subsequently disciplined or terminated for inappropriate workplace behavior."  [Filing No. 65 at 9.]

To survive summary judgment on his retaliation claims under Title VII and § 1981, Mr. Jett must present evidence that he "'suffered a materially adverse action because he engaged in protected activity.'"  *Lloyd*, 761 Fed. App'x at 611-12 (quoting *Shott v. Katz*, 829 F.3d 494, 497 (7th Cir. 2016)); *see also Mintz v. Caterpillar Inc.*, 788 F.3d 673, 679 (7th Cir. 2015) (courts apply the same standards to retaliation claims brought under Title VII and § 1981).  A plaintiff engages in protected activity by, among other things, "opposing an unlawful employment practice." *Northington v. H & M Int'l*, 712 F.3d 1062, 1065 (7th Cir. 2013).  The Seventh Circuit has explained that "a report of discrimination to a supervisor may be statutorily protected activity" if it includes a complaint of discrimination based on a protected characteristic "or sufficient facts to raise that inference," *Andonissamy v. Hewlett-Packard Co.*, 547 F.3d 841, 851 (7th Cir. 2008), but "[v]ague and obscure complaints do not constitute protected activity," *Northington*, 712 F.3d at

1065 (quotation and citation omitted).  The ultimate question is "whether the evidence produced would permit a reasonable factfinder to conclude [Mr. Jett's race] caused the discharge." *Swyear v. Fare Foods Corp.*, 911 F.3d 874, 885 (7th Cir. 2018).

ISS again relies on its own version of events in seeking summary judgment on Mr. Jett's Title VII and § 1981 retaliation claims.  First, as to whether Mr. Jett engaged in statutorily protected activity, the Court finds that a reasonable jury could conclude that Mr. Jett's December 3, 2019 email to Mr. Martin could be construed as a complaint regarding race discrimination.  Mr. Jett discussed a "verbal tirade" and stated that Mr. Greaves – the only other African American on the HVAC team at ISS – also wanted to meet with Mr. Martin.  A reasonable jury could find that this constituted a complaint regarding racial discrimination.  Similarly, there is a genuine issue of fact regarding whether Mr. Jett verbally complained to Ms. Hunt on December 4, 2019 regarding race discrimination by Mr. Parrish.  Mr. Jett avers that:

> On the morning of December 4, 2019, [Ms. Hunt] stopped me on the first floor of the North Building just down from the mail room.  I then told [Ms. Hunt] that [Mr. Parrish] and [Mr. Johnson] were trying to get me fired and that I believed [they] treat [Mr. Greaves] and I differently than everyone else.  I informed her about how the previous day [Mr. Parrish] came running to the 4th floor where [Mr. Greaves] and I were working.  He start[ed] yelling at us and saying that we were disrespecting him.

[Filing No. 60-6 at 4-5.]  As discussed above, the Court credits Mr. Jett's Affidavit at the summary judgment stage of this case.  And while Mr. Jett does not explicitly mention race discrimination, a reasonable jury could find that Mr. Jett was complaining about race discrimination since he referenced himself and the only other African American on the HVAC team at ISS as individuals that Mr. Parrish treated "differently than everyone else."  [Filing No. 60-6 at 4-5.]

As to whether Mr. Jett has presented evidence of a causal connection between his complaints and his termination, the Court finds that he has.  ISS relies on the fact that the

November 13, 2019 Incident pre-dated Mr. Jett's complaint, but the complaints about and investigation of the November 13, 2019 Incident do not pre-date Mr. Jett's complaints. In fact, they followed immediately after Mr. Jett's email to Mr. Martin. Ms. Bailey's complaint led directly to the investigation of the November 13, 2019 Incident, which led directly to Mr. Jett's termination. And ISS did not investigate or terminate Mr. Johnson, despite the fact that he was also present for the November 13, 2019 Incident, was authorized to perform the LOTO Procedure, and had to perform the LOTO Procedure due to Mr. Jett's cataracts. *See Nachampassack v. Ill. St. Toll Highway Auth.*, 2022 WL 952356, at *16 (Mar. 30, 2022) ("[T]o establish causation, a plaintiff can either rely on direct evidence or 'circumstantial evidence like suspicious timing, ambiguous statements, treatment of similarly-situated employees, and any other relevant information that could permit an inference of retaliation.'") (quoting *Robertson v. Dep't of Health Servs.*, 949 F.3d 371, 379 (7th Cir. 2020)).

Mr. Jett has set forth sufficient evidence from which a reasonable jury could conclude that ISS engaged in retaliation in violation of Title VII and § 1981 when it terminated Mr. Jett. Accordingly, the Court **DENIES** ISS's Motion for Summary Judgment on Mr. Jett's Title VII and § 1981 retaliation claims.

### 4.    *ADEA Discrimination Claim*

ISS sets forth the same arguments in support of its Motion for Summary Judgment on Mr. Jett's ADEA discrimination claim as it did on Mr. Jett's Title VII and § 1981 race discrimination claims. [*See* Filing No. 53 at 6-12.] Specifically, it argues that Mr. Jett was not meeting ISS's legitimate expectations, that he has not identified a similarly situated comparator, and that he was fired for legitimate and non-discriminatory reasons. [Filing No. 53 at 6-12.]

Mr. Jett responds that he was meeting ISS's legitimate expectations, that Mr. Johnson is a similarly situated comparator and was under the age of forty when Mr. Jett was terminated, and that Mr. Jett has presented evidence of pretext. [Filing No. 60 at 14-21.]

ISS reiterates its arguments in its reply. [Filing No. 65 at 1-7.]

The ADEA makes it unlawful for employers to discriminate against employees who are forty years old or older because of their age. 29 U.S.C. § 623. To prove his claim, Mr. Jett must show that his age "was the 'but-for' cause of the challenged [adverse employment] action." *Wrolstad v. Cuna Mut. Ins. Soc'y*, 911 F.3d 450, 454 (7th Cir. 2018) (citing *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177-78 (2009)). "[U]nder the ADEA, it's not enough to show that age was a motivating factor," but rather a plaintiff "must prove that, but for [her] age, the adverse action would not have occurred." *Wrolstad*, 911 F.3d at 454 (quotations, citations, and emphasis omitted). The same framework used for evaluating Title VII and § 1981 claims, as set forth above, is also used for evaluating discrimination claims under the ADEA. *David v. Bd. of Trustees of Comm. Coll. Dist. No. 508*, 846 F.3d 216, 224-25 (7th Cir. 2017).

As with Mr. Jett's Title VII and § 1981 discrimination claims, Mr. Jett has presented sufficient evidence to create a genuine issue of fact regarding whether he was meeting ISS's legitimate expectations – specifically, that Mr. Jett had cataracts due to a medical condition and could not perform the LOTO Procedure, and that Mr. Parrish was only concerned about the LOTO Procedure being performed when ISS was working with outside contractors or when technicians were waiting on equipment.

As to a similarly situated comparator, the Court has already concluded that Mr. Jett has presented evidence from which a reasonable jury could conclude that Mr. Johnson and Mr. Jett were similarly situated. Mr. Jett must also show that Mr. Johnson was under the age of forty to

succeed on his ADEA retaliation claim, and the parties dispute whether he has done so.  ISS argues that Mr. Jett relies on Mr. Parrish's deposition testimony, in which he stated "I believe [Mr. Johnson] is 39."  [Filing No. 60-3 at 35-36.]  Mr. Parrish's full testimony relating to Mr. Johnson's age was as follows:

> Q:  What about Andrew Johnson, is he over the age of 40?
>
> A:  Not yet.
>
> Q: How old is Andrew Johnson?
>
> A:  I believe he's 39 because he's pretty close to my age.

[Filing No. 60-3 at 35-36.]  Again, viewing the evidence in the light most favorable to Mr. Jett as it must at this stage of the proceedings, the Court finds that this testimony is sufficient to, at the very least, create a genuine issue of fact regarding whether Mr. Johnson was under forty when Mr. Jett was terminated.[6]  Accordingly, Mr. Jett has set forth a similarly situated comparator in support of his ADEA discrimination claim.

As for pretext, Mr. Jett relies on some of the same evidence that he relies upon in support of his Title VII and § 1981 discrimination claims, including that:

- Mr. Jett could not perform the LOTO Procedure because of his cataracts, which Mr. Parrish was aware of.  Instead, Mr. Johnson had been performing all LOTO Procedures.  But Mr. Johnson, who was present at the November 13, 2019 Incident and was under forty, was not terminated.

- Mr. Johnson, who was under forty, frequently did not perform the LOTO Procedure and did not perform it in connection with the November 13, 2019 Incident, yet he was not terminated.

---

[6] If Mr. Johnson was, indeed, over age forty when Mr. Jett was terminated, it is curious that ISS chose to nitpick Mr. Parrish's deposition testimony rather than to file an affidavit from Mr. Johnson stating his correct age.

As with his Title VII and § 1981 race discrimination claims, the Court finds that Mr. Jett has presented sufficient evidence from which a reasonable jury could conclude that Mr. Jett was fired due to his age, in violation of the ADEA.  ISS's Motion for Summary Judgment on Mr. Jett's ADEA discrimination claim is **DENIED**.

### III.
### CONCLUSION

For the foregoing reasons:

- ISS's Motion for Summary Judgment, [52], is **GRANTED IN PART** to the extent that ISS is entitled to judgment on Mr. Jett's failure-to-promote claims under Title VII and § 1981;

- ISS's Motion for Summary Judgment, [52], is **DENIED IN PART** to the extent that ISS is not entitled to judgment on Mr. Jett's Title VII and § 1981 race discrimination and retaliation claims or his ADEA discrimination claim, and those claims will proceed; and

- ISS's Motion to Strike Plaintiff's Brief in Opposition to Defendant's Motion for Summary Judgment, [66], is **DENIED**.

The Court requests that the Magistrate Judge confer with the parties as soon as practicable to discuss the resolution of the remaining claims short of trial.

Date: 5/3/2022

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

**Distribution via ECF only to all counsel of record**

27